# United States Court of Appeals for the Federal Circuit

———————————

**WALTER B. FREEMAN, RNR RESOURCES, LLC, MICHELLE L. HARRIS, SANDRA LEE FINCHER, JAMES R. OMUNDSON,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2016-2694

———————————

Appeal from the United States Court of Federal Claims in No. 1:01-cv-00039-NBF, Senior Judge Nancy B. Firestone.

———————————

Decided: November 3, 2017

———————————

RICHARD MERRITT STEPHENS, Stephens & Klinge LLP, Bellevue, WA, argued for plaintiffs-appellants.

AVI KUPFER, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY H. WOOD.

———————————

Before PROST, *Chief Judge,* WALLACH and STOLL, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellants Walter B. Freeman, RNR Resources, LLC ("RNR"), Michelle L. Harris, Sandra Lee Fincher, and James R. Omundson (collectively, "Appellants") sued Appellee the United States ("the Government"), alleging, inter alia, a regulatory taking of RNR's mining claims by the Government. The U.S. Court of Federal Claims granted the Government's motion to dismiss Appellants' regulatory taking claim for lack of subject matter jurisdiction because the claim was not ripe. *Freeman v. United States* (*Freeman I*), 124 Fed. Cl. 1, 2 (2015); *see Freeman v. United States* (*Freeman II*), No. 01-39L, 2016 WL 943859, at *1 (Fed. Cl. Mar. 1, 2016) (denying reconsideration). Appellants appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012). We affirm.

BACKGROUND

RNR, which is solely owned by Mr. Freeman,[1] located eight mining claims on public lands of the Rogue River Siskiyou National Forest. *See* J.A. 41–42. In 2011, RNR filed a plan of operations ("the Plan") with the U.S. Forest Service ("Forest Service") "to authorize commercial mining of the[se] new mining claims" as required by regulation.[2] J.A. 42; *see* J.A. 245. The Plan describes a project to mine ore that "contains commercially recoverable

---

[1]    In reciting the facts, we refer to "RNR" and "Mr. Freeman" interchangeably.

[2]    The operative complaint explains that, after RNR filed the Plan, Michelle L. Harris, Sandra Lee Fincher, and James R. Omundson issued quitclaim deeds to RNR, but each of these three individuals continued to be "named as plaintiffs because of the Anti-Assignment Act," J.A. 42, apparently referring to 31 U.S.C. § 3727 (2012).

amounts of nickel, chromium[,] and iron" from two deposits over the course of thirty years. J.A. 269; *see* J.A. 251. In order to haul the mined and screened ore to a processing site, RNR proposed construction of nearly eight miles of new roads, excavation of a pit for water storage, and construction of two crossings over a creek. J.A. 270–71. RNR also proposed the creation of a processing facility "on an approximately [twenty] acre site," J.A. 271; *see* J.A. 264 (map with location of facility), which was to be located on lands managed by the U.S. Department of the Interior's Bureau of Land Management ("BLM"), J.A. 105.

After receiving the Plan, District Ranger Roy Bergstrom directed Area Mining Geologist Kevin Johnson to review the Plan. J.A. 103–04, 154. During two separate telephone conversations that occurred soon after RNR filed the Plan, Mr. Freeman discussed with Messrs. Bergstrom and Johnson the potential of "conducting a bulk sample of minerals on his mining claims" to collect "10–15 tons of material." J.A. 104; *see* J.A. 155, 342. During these discussions, Messrs. Bergstrom and Johnson eventually advised Mr. Freeman to submit a written proposal of the bulk sampling to include in the Plan. J.A. 104, 155. Mr. Johnson also informed Mr. Freeman that the Forest Service needed additional time to provide a formal response to the Plan given its complexity. J.A. 291.

In March 2012, Mr. Johnson sent a memorandum to Mr. Bergstrom with his assessment of the Plan. *See* J.A. 291–93. Mr. Johnson understood that Mr. Freeman planned to build a full-production "processing facility" that would include, inter alia, "a rotary kiln," "three . . . ore storage buildings," a "furnace/metal processing building," and "a supply storage building." J.A. 291. Mr. Johnson, however, noted that the BLM office "had not received a plan of operation from Mr. Freeman for the construction of [this full-production] processing facility," despite the Plan's proposal to con-

struct the processing facility on BLM-managed lands.[3] J.A. 292; *see* J.A. 242 (explaining that Mr. Johnson checked with the BLM every one to two months about the status of Mr. Freeman's BLM plan of operations). Mr. Johnson also indicated that the Plan did not include a "discussion of the operator owning or obtaining a water right for the operating facility." J.A. 292. He explained that RNR would need to construct a pilot-prototype plant,[4] which he identified as "a standard practice in the mining industry." J.A. 292. According to Mr. Johnson, a pilot-prototype plant would allow Mr. Freeman to determine economic feasibility, evaluate treatment and disposal of waste, and identify the best potential product to be processed. J.A. 292–93. Therefore, Mr. Johnson concluded:

> [The Plan] is not reasonable and does not represent the next logical or sequential step in the development of this deposit in a mine of this size and scope. I recommend that the [Plan] be returned to Mr. Freeman with the suggestion that *he submit a proposal for bulk sampling and construction of a pilot-prototype plant* that can pro-

---

[3] The requirement to submit a plan of operations to the BLM to receive approval to construct a processing facility is separate and distinct from the requirement to submit a plan of operations (e.g., the Plan in this case) to the Forest Service to conduct operations that might affect surface resources. *Compare* 36 C.F.R. § 228.4(a)(4) (2016) (requiring plan of operations to the Forest Service), *with* 43 C.F.R. § 3809.11 (2016) (requiring plan of operations to the BLM).

[4] Mr. Bergstrom described the pilot-prototype plant as a necessary step before "scaling up to [the] full[-]production processing facility" identified in the Plan. J.A. 294.

cess the bulk sample so that it can be determined if production scaled mining and smelting is feasible.

J.A. 293 (emphasis added).

In July 2012, Mr. Bergstrom sent Mr. Freeman a letter containing the Forest Service's written response to the Plan and attached Mr. Johnson's memorandum. J.A. 294–95. Mr. Bergstrom specifically explained that the Plan "will not be *processed* until [Mr. Freeman] provide[s] additional information and changes to the [P]lan *as outlined in Mr. Johnson's memorandum.*" J.A. 294 (emphases added). The letter highlighted the lack of a pilot-prototype plant and Mr. Freeman's failure to submit a companion plan to the BLM for construction of a full-production processing facility. J.A. 294. Mr. Bergstrom requested Mr. Freeman "reconsider [his] proposal," "submit a new plan . . . with more detail," and provide "confirmation that [he] ha[s] submitted a plan to the BLM." J.A. 295.

During a meeting in September 2012 to discuss "next steps" in light of the July 2012 letter, Messrs. Bergstrom and Johnson reiterated the need for a pilot-prototype plant. J.A. 249; *see* J.A. 337. Although Mr. Freeman asked Messrs. Bergstrom and Johnson to tell him "how large a sample [for] the pilot[-prototype] plant" was needed, they responded "that it was not up to [the Forest Service] to determine . . . the amount of material, but it was [Mr. Freeman's] responsibility [to] show that it was feasible to ramp up the process to a production capacity." J.A. 249. According to Mr. Freeman's characterization of the meeting, Mr. Bergstrom "confirm[ed] that [he] would not *process the pending plan of operations* [(i.e., the Plan)] without pilot[-prototype] plant work." J.A. 337 (emphasis added).

Thereafter, Mr. Bergstrom requested more specific information from Mr. Johnson related to comments made by

Mr. Freeman during this meeting. J.A. 310. In response, Mr. Johnson prepared a second memorandum in June 2013. J.A. 310–19. Mr. Bergstrom sent a letter with Mr. Johnson's latest memorandum to Mr. Freeman. J.A. 320. Mr. Bergstrom noted that there were "a number of items that are insufficient" in the Plan, and listed some new and previously-identified deficiencies, such as "information on air and water quality, solid waste, scenic values, fisheries and wildlife habitat, and roads." J.A. 320. He reiterated that RNR still needed to submit a plan to the BLM for the full-production processing facility. *See* J.A. 320 (mentioning that, "[b]ased on recent studies," the proposed processing facility "may have some technical issues that may make it currently not feasible"). To date, RNR has not responded to the Forest Service's requests for additional information, including the submission of a bulk sampling proposal, the development of a pilot-prototype plant, or the filing of a plan of operations with the BLM for the construction of a full-production processing facility. *See* Oral Arg. at 14:00–30, http://oralarguments.cafc.uscourts. gov/default.aspx?fl=2016-2694.mp3; J.A. 297.

Instead of providing any of this additional information, Appellants sued the Government, alleging, inter alia, a regulatory taking of RNR's mining claims.[5]

---

[5] Before filing its complaint, RNR attempted to appeal the July 2012 letter to the Rogue River Siskiyou National Forest Supervisor, J.A. 298–99, but the Forest Supervisor determined the letter was not an appealable, final decision and encouraged RNR to work with Mr. Bergstrom to complete its application, J.A. 302. RNR appealed the denial of its appeal to a Regional Forester, J.A. 303–05, who agreed with the Forest Supervisor's determination that the letter was not an appealable, final decision but rather a request for additional information, J.A. 309.

J.A. 33, 47–48. The Government moved to dismiss for lack of subject matter jurisdiction. *See Freeman I*, 124 Fed. Cl. at 1. Appellants filed a motion for "authorization of discovery," J.A. 491 (capitalization modified), which the Court of Federal Claims denied, J.A. 68. The Court of Federal Claims granted the Government's Motion to Dismiss RNR's claim as unripe, *Freeman I*, 124 Fed. Cl. at 2, and denied Appellants' motion for reconsideration, *Freeman II*, 2016 WL 943859, at *1.

DISCUSSION

I. Standard of Review and Legal Standard

We review de novo the Court of Federal Claims' dismissal of a claim as unripe. *Barlow & Haun, Inc. v. United States*, 805 F.3d 1049, 1054 (Fed. Cir. 2015). We review underlying factual findings by the Court of Federal Claims for clear error. *Id.* When, as here, a motion to dismiss "challenges the truth of the jurisdictional facts," the Court of Federal Claims "may consider relevant evidence in order to resolve the factual dispute." *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (internal quotation marks and citation omitted). "In such cases, the plaintiff has the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Id.* (citation omitted).

The Fifth Amendment prohibits the Government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. Generally, "a claim for a regulatory taking is not ripe until the [G]overnment entity charged with implementing the regulations has reached a *final decision* regarding the application of the regulations to the property at issue." *Barlow & Haun*, 805 F.3d at 1058 (emphasis added) (internal quotation marks and citation omitted); *see Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 190 (1985) ("Our reluctance to examine taking claims until such a final decision has been

made is compelled by the very nature of the in-
quiry . . . ."). "[A] court must determine whether a party
has obtained a final decision from the reviewing agency[]
or whether the final decision was unnecessary due to lack
of discretion on the agency's part." *Barlow & Haun*, 805
F.3d at 1058 (citing *Palazzolo v. Rhode Island*, 533 U.S.
606, 618–20 (2001)). "A permit denial is final when the
applicant has no appeal mechanism available and the
denial is based on an *unchanging fact*." *Cooley v. United
States*, 324 F.3d 1297, 1302 (Fed. Cir. 2003) (emphasis
added) (citation omitted).

A failure to secure a final decision may be excused
under the futility exception, "where [an] agency's decision
makes clear that pursuing remaining administrative
remedies will not result in a different outcome." *Morris v.
United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004).
Indeed, "Government authorities . . . may not burden
property by imposition of repetitive or unfair land-use
procedures in order to avoid a final decision." *Palazzolo*,
533 U.S. at 621. The private party, however, must first
"follow[] reasonable and necessary steps to allow regula-
tory agencies to exercise their full discretion." *Id.* at 620.

## II. RNR's Regulatory Taking Claim Is Not Ripe for Review

The Court of Federal Claims determined that Appel-
lants' claim was not ripe because: (1) the Forest Service
had not issued a final decision regarding the Plan; and
(2) the futility exception did not apply. *Freeman I*, 124
Fed. Cl. at 7–9. Appellants challenge both findings on
appeal. *See* Appellants' Br. 16–26 (addressing the final
decision requirement), 38–39 (addressing the futility
exception). We address these issues in turn.

### A. The Forest Service Has Not Reached a Final Decision

The Forest Service has a process through which pri-
vate parties may obtain permission to mine. By regula-

tion, the Forest Service requires "any person proposing to conduct operations which might cause significant disturbance of surface resources" to submit a notice of intent to operate to a District Ranger. 36 C.F.R. § 228.4(a); *see* 30 U.S.C. § 612(b) (2012) (subjecting mining claims to certain restrictions); *see also United States v. Shumway*, 199 F.3d 1093, 1107 (9th Cir. 1999) ("[T]he Forest Service may regulate use of National Forest lands by holders of unpatented mining claims . . . ."). "If the District Ranger determines that any operation is causing or will likely cause significant disturbance of surface resources, the District Ranger shall notify the operator that the operator must submit a proposed plan of operations for approval . . . ." 36 C.F.R. § 228.4(a)(4); *see id.* § 228.4(c) (listing the required contents of a plan of operations). Within thirty days of receiving a plan of operations, the District Ranger shall "analyze the proposal," *id.* § 228.5(a), and then, relevant here, either: "approve[] the plan," *id.* § 228.5(a)(1); "[n]otify the operator of any changes in, or additions to, the plan of operations deemed necessary to meet the purpose of the regulations," *id.* § 228.5(a)(3); or "[n]otify the operator that the plan is being reviewed, but that more time, not to exceed an additional sixty . . . days, is necessary to complete such review, setting forth the reasons why additional time is needed," *id.* § 228.5(a)(4). The regulations list the "[a]pproval or denial of an initial, modified, or supplemental plan of operations" as decisions that are appealable, *id.* § 214.4(b)(1), and provide that an "[o]fficial" must "give written notice of decisions subject to appeal" by "specify[ing] the contents of an appeal, the name and mailing address of the Appeal Deciding Officer, and the filing deadline," *id.* § 214.6(a), (b).

Appellants do not dispute that this regulatory process applies here; indeed, RNR filed the Plan with the Forest Service in accordance with § 228.4(a)(4). *See* J.A. 251. Instead, Appellants contend that RNR completed this regulatory process and received a final decision in the

form of the July 2012 letter from Mr. Bergstrom. *See* Appellants' Br. 17. The Court of Federal Claims agreed with the Forest Supervisor and the Regional Forester's determinations that the July 2012 letter was not a final, appealable decision. *See Freeman I*, 124 Fed. Cl. at 8; *see also* J.A. 302 (Forest Supervisor's decision), 309 (Regional Forester's decision). We agree with the Court of Federal Claims.

Tellingly, Appellants concede they never received a notice of a final decision that is appealable as provided in § 214.6. *See* Oral Arg. at 1:34–41 (Q: "Did RNR receive a notice of appealable decision?" A: "They did not receive a document that said that."). Additionally, we have articulated "[t]he rule that a taking does not ripen unless a permit is applied for and *denied*." *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1351 (Fed. Cir. 2002) (emphasis added). The Forest Service did not deny the Plan, but instead notified RNR of "additions to[] the [P]lan . . . deemed necessary," 36 C.F.R. § 228.5(a)(3), including the need to submit a bulk sampling proposal, construct a pilot-prototype plant, file a plan of operations with the BLM, and obtain water rights for the processing facility, J.A. 292–94, 320, to which RNR did not respond, J.A. 104–05, 155–56.[6] Accordingly, the Forest Service has not reached a final decision on the Plan.

---

[6] Despite RNR's repeated failure to submit the requested information, the Forest Service has continued to work with RNR by reviewing the Plan on more than one occasion and providing additional details regarding these major deficiencies. J.A. 292–93, 320–21; *see* J.A. 294 (citing § 228.5(a)(3)'s authorization to request additional information). The Forest Service also made clear that RNR must provide missing "information on air and water quality, solid waste, scenic values, fisheries and wildlife habitat, and roads." J.A. 320. To date, RNR still has not

### B. The Futility Exception Does Not Excuse Appellants' Failure to Secure a Final Decision

Appellants argue, in the alternative, that compliance with the Forest Service's additional requests would be futile because continuing to pursue the administrative process would not result in a different outcome. Appellants' Br. 38–39. We are not convinced compliance with those requests would be futile.

The Forest Service's communications with RNR nowhere implied or stated that pursuing administrative remedies would be fruitless. *See Morris*, 392 F.3d at 1376. The record reveals quite the opposite. As discussed above, the Forest Service identified particular deficiencies in the Plan and asked RNR to cure those deficiencies. *See* J.A. 292–94. The Forest Service demonstrably tried to work with RNR to complete its application. Messrs. Bergstrom and Johnson had telephonic and in-person meetings with Mr. Freeman, J.A. 104, 155, 249, and they exchanged several letters with RNR relating to the Plan and the next steps required of RNR, J.A. 289, 294, 320; *see McGuire v. United States*, 707 F.3d 1351, 1362 (Fed. Cir. 2013) (holding the futility exception did not apply where agency's correspondence made clear that applicant "needed to do more to exhaust his [administrative] remedies"). Without more, we cannot say that the Forest Service would have denied a re-submitted version of the Plan that included the missing information.

Appellants suggest that the Forest Service has an ulterior motive to prevent RNR from mining by "moving the goal posts" and continuing to find additional deficiencies with the Plan, such that compliance with the requests

---

complied with these requests. *See* Oral Arg. at 14:00–30 (acknowledging that RNR has not fulfilled the Forest Service's requests for additional information).

would not further RNR's chances of securing a permit. Appellants' Br. 39; *see* Oral Arg. at 3:12–5:32 (discussing concerns with reasonableness of the pilot-prototype plant requirement). Appellants posit that the July 2012 letter amounts to a final decision because the Forest Service's guidance on the size and scope of a pilot-prototype plant was vague and therefore unfair, and the creation of such a plant would not have enabled the Forest Service to exercise its full discretion as such a requirement was unreasonable. *See* Appellants' Br. 17–18; *see also Palazzolo*, 533 U.S. at 620. These arguments lack merit.

First, the fact that the Forest Service did not clearly lay out the requirements of a pilot-prototype plant neither renders its request an unfair attempt to avoid a final decision, nor releases RNR from its obligation to comply with that request. The Forest Service indicated that the purpose of creating a pilot-prototype plant was to verify the commercial viability of the Plan. *See* J.A. 249 (explaining RNR needed to show "that it was feasible to ramp up the process to a production capacity"), 293 (discussing the need to determine feasibility of "production scaled mining and smelting"). The Forest Service's rejection is reasonably related to its regulations' "purpose" of "minimiz[ing] adverse environmental impacts" of mining operations "on National Forest System surface resources." 36 C.F.R. § 228.1. Appellants fail to identify why the creation of a pilot-prototype plant, which the Forest Service has identified as a standard industry practice for metallurgically complex deposits, J.A. 292, would be unreasonable or unnecessary given the factual circumstances present here, *see generally* Appellants' Br. Instead, the Forest Service, just as the agency involved in *Wyatt v. United States*, is afforded discretion "in determining what additional information is required to satisfy statutorily imposed obligations" to "implement [its] complex permitting schemes." 271 F.3d 1090, 1098 (Fed. Cir. 2001). On this record, we do not believe the pilot-

prototype plant requirement is repetitive or unfair. *See Palazzolo*, 533 U.S. at 621 (warning against "imposition of repetitive or unfair" practices by the Government "to avoid a final decision").

Second, Appellants do not provide evidence to support their speculation of an ulterior motive by the Forest Service. *See generally* Appellants' Br. Appellants' bare assertion fails to rebut our long-recognized "presumption that government officials act in good faith." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Rather, "the deficiency of completeness in the application process [is] attributable" to RNR. *Washoe Cty. v. United States*, 319 F.3d 1320, 1324 (Fed. Cir. 2003). Moreover, as we have explained in another context, even if "an adverse decision may have been likely," which RNR has not shown here, that fact alone "does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (discussing the futility exception in an international trade dispute). Accordingly, we find it inappropriate to excuse Appellants' failure to secure a final decision as futile, and we hold that their claim is not ripe for review.[7] Appellants may still ripen their claim by

---

[7] Appellants also argue that the Forest Service failed to follow its own regulations by not notifying RNR of a need for additional information within thirty days, as required by § 228.5(a). Appellants' Br. 19. However, Appellants do not argue that this delay ripens their claim, nor do they contend that this delay is a taking by itself. *See generally id.* A party's failure to make arguments under the operative legal framework "typically warrants a finding of waiver." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016). In any event, for delay in governmental decision making to

submitting the additional information requested by the
Forest Service and securing a final decision.

III. Appellants' Remaining Arguments Are Unavailing

Appellants also argue that the Court of Federal
Claims erred by not allowing discovery of jurisdictional
facts, an evidentiary hearing, or deferral of the ripeness
inquiry until there could be a trial on the merits. Appel-
lants' Br. 29–38. We review the Court of Federal Claims'
denial of a discovery request and its evidentiary rulings
for an abuse of discretion. *See Rick's Mushroom Serv.,
Inc. v. United States*, 521 F.3d 1338, 1342 (Fed. Cir. 2008)
(requests for discovery); *Taylor v. United States*, 303 F.3d
1357, 1359 (Fed. Cir. 2002) (evidentiary rulings). There
was no abuse of discretion here.

First, the Court of Federal Claims did not abuse its
discretion by denying Appellants' request for discovery.
Appellants have failed to point to any legal error in the
Court of Federal Claims' decision. *See* Appellants' Br. 29–
38. Rather, the Rules of the Court of Federal Claims
("RCFC") support the decision to deny discovery. The
rules allow for discovery only after "the parties have
conferred." RCFC 26(d)(1) (2016). That conference typi-
cally occurs after the Government files an answer. RCFC
App. A ¶ 3. Neither the filing of an answer nor a confer-
ence had occurred here. *See* J.A. 68; Appellants' Br. 31.
Recognizing this, the Court of Federal Claims denied
Appellants' request for discovery, finding no reason to

---

constitute a taking, we have recognized that more egre-
gious facts than those present here are required. *See, e.g.*,
*Wyatt*, 271 F.3d at 1098 (recognizing both that the "Su-
preme Court has condoned delays up to approximately
eight years" and that we rarely find a taking due to
extraordinary delay "without a showing of bad faith"
(internal quotation marks and citation omitted)).

deviate from the procedure contemplated by the rules. *See* J.A. 68 ("Discovery shall proceed in accordance with the rules."). Appellants have also failed to meet their burden to proffer with sufficient specificity the jurisdictional facts that they believe would have been discovered to change the Court of Federal Claims' jurisdictional finding. *See* Oral Arg. at 7:04–23 (Q: "What did you specifically ask the Court of Federal Claims to let you discover—what facts?" A: "We did not identify specific facts."); *see also Smith v. United States*, 495 F. App'x 44, 49 (Fed. Cir. 2012) (holding the Court of Federal Claims did not abuse its discretion by denying a discovery request where appellant "failed to explain with sufficient specificity how discovery would help him overcome the various jurisdictional bars to his suit").

Second, as to the denial of an evidentiary hearing or deferral of the ripeness inquiry until trial, there is no dispute over any facts relevant to ripeness. RNR failed to complete the administrative process to secure a permit. Indeed, before the Court of Federal Claims, Appellants "acknowledge[d] that there 'appears to be no dispute as to what RNR filed, when it was filed, and when or what the Forest Service's response was.'" *Freeman II*, 2016 WL 943859, at *3 (quoting Pl.'s Reply 3–4, *Freeman v. United States*, No. 1:01-cv-00039-NBF, ECF No. 209). Accordingly, we find no error with the Court of Federal Claims' discovery and evidentiary rulings.

CONCLUSION

We have considered Appellants' remaining arguments and find them unpersuasive. Accordingly, the Final Judgment of the U.S. Court of Federal Claims is

**AFFIRMED**